546

EDWARD R. STORY, *Respondent,* v. DELMON
L. ANDERSON, ET AL, *Appellants.*

*David F. Thiele, Prosecuting Attorney,* and *Alan R. Hancock, Deputy,* for appellants.

*Ted D. Zylstra* (of *Zylstra & Beeksma*), for respondent.

*Slade Gorton, Attorney General,* and *Philip H. Austin, Deputy,* amici curiae.

UTTER, C.J.—An opinion in this case was reported in *Story v. Anderson,* 91 Wn.2d 667, 588 P.2d 1179, 590 P.2d 1272 (1979). We granted reconsideration, and now vacate our earlier opinion and affirm the trial court's holding that the Island County district scheme for electing county commissioners violates the equal protection clause of the fourteenth amendment to the United States Constitution.

Under the statutory provisions governing elections of county commissioners in this state, every county must be divided into three commissioner districts. RCW 36.32.020. The board of county commissioners consists of three commissioners, each of whom resides in one of the three districts. RCW 36.32.010, 36.32.050. The candidates for each position are nominated by the qualified voters of their district. RCW 36.32.040. Nomination is either through the primary election or a minor party convention. RCW 29.18, 29.24. The voters in the entire county then vote in a general election to select commissioners from the pool of candidates for each position. RCW 36.32.050.

The general requirement for drawing district lines is that each of the three districts in the county must comprise, "as nearly as possible one–third of the population of the county". RCW 36.32.020. However, a special statutory exception permits counties which are composed entirely of islands to draw district lines without regard for population. RCW 36.32.020(1) provides that:

> The commissioners of any county composed entirely of islands may divide their county into three commissioner districts without regard to population, except that if any

single island is included in more than one district, the districts on such island shall comprise, as nearly as possible, equal populations;

The Island County commissioner district scheme was established pursuant to this statutory provision. Island County is located in Puget Sound and consists primarily of Whidbey Island, Camano Island, and two small, relatively unpopulated islands. The county is divided into three commissioner districts. The first is made up of central and south Whidbey Island, the second of northern Whidbey Island, and the third encompasses all of Camano Island. The first district has a predominantly agricultural area in central Whidbey Island, with the southern part of the district consisting of open space with a scattering of commercial and residential development. District two has a large naval airfield within its boundaries and also contains the city of Oak Harbor. Commissioner district three, Camano Island, is essentially a residential area with the shorelines completely populated and residential development of inland areas as well.

The population of Island County on June 9, 1977, included 9,228 persons in district one; 24,646 in district two; and 3,589 in district three. As of April 1, 1977, the registered voter totals in the respective districts were 6,058 in district one; 7,657 in district two; and 2,510 in district three.

Respondent Edward Story, a resident of north Whidbey Island, claims that the primary election scheme as applied to Island County violates the equal protection clause of the fourteenth amendment to the United States Constitution because the inequality of populations of the three districts results in more strongly weighted votes for the residents of the smaller districts. The combination of the primary and general elections assures the voters from district three that even though they comprise less than 10 percent of the total population and just over 15 percent of the registered voters, nonetheless a candidate chosen by that district alone in the primary election will exercise one–third of the voting power

of the entire county as an elected county commissioner. Respondent sought a writ of mandamus in superior court directing the commissioners of Island County to divide the county into three districts which would each comprise, as nearly as possible, one–third of the population of the county. The trial court found that the Island County district scheme violates equal protection, and granted the writ of mandamus to redivide the districts. We granted direct review of this decision.

■ The equal protection clause requires that all citizens be permitted to participate equally in the election process. *Reynolds v. Sims,* 377 U.S. 533, 565–66, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964). This constitutional principle produces two fundamental requirements in establishing state voting districts: (1) The districts must have "substantial equality of population" in order to insure that "the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds v. Sims, supra* at 579. (2) In establishing these equally large districts, the district lines must not be drawn in such a way as to invidiously dilute the voting strength of a particular racial or political element of the voting population. *White v. Regester,* 412 U.S. 755, 765–70, 37 L. Ed. 2d 314, 93 S. Ct. 2332 (1973). *See generally* L. Tribe, *American Constitutional Law* 738–67 (1978). Different analyses are employed for violations of these two requirements. When a violation of the first requirement, the "one person, one vote" principle, is alleged, the focus is on whether there are impermissibly large deviations in population among the voting districts. *E.g., Reynolds v. Sims, supra* at 579–80. When violations of the latter requirement are claimed, the focus is on whether there has been invidious discrimination against racial or political groups, rather than on whether there is mathematical exactness of voting populations. *E.g., Dallas County v. Reese,* 421 U.S. 477, 480, 44 L. Ed. 2d 312, 95 S. Ct. 1706 (1975).

In the present case, respondent Edward Story claims only that the inequality of the Island County district populations violates the one person, one vote requirement. The one person, one vote principle requires "substantial equality of population" among state voting districts (*Reynolds v. Sims, supra* at 579), in order to "insure, as far as is practicable, that equal numbers of voters can vote for proportionately equal numbers of officials." *Hadley v. Junior College Dist.*, 397 U.S. 50, 56, 25 L. Ed. 2d 45, 90 S. Ct. 791 (1970). "[T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." *Reynolds,* at 567. Although federal congressional districts must be precisely equal in population, state voting districts may deviate from the strict equality requirement in order to effectuate legitimate, rational state policies. *Mahan v. Howell,* 410 U.S. 315, 320–23, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973). However, the inequality in population among state districts must be no more than minor inequality. "[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds,* at 579. Moreover the uneven apportionment must be justified by something more than economic interests, history, population density, or geography:

> [N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population–based representation. . . . Modern developments and improvements in transportation and communications make rather hollow, in the mid–1960's, most claims that deviations from population–based representation can validly be based solely on geographical considerations.

(Footnote omitted.) *Reynolds,* at 579–80. Thus, in cases involving inequality of population of state voting districts,

there are two questions to be asked: (1) Is the inequality merely a minor deviation from the one person, one vote requirement? And, (2) If it is merely minor, is the deviation justified in order to achieve legitimate, rational state objectives?

The one person, one vote requirement applies to local elections of county commissioners. *Avery v. Midland County,* 390 U.S. 474, 479–85, 20 L. Ed. 2d 45, 88 S. Ct. 1114 (1968). Accordingly, the Island County commissioner election scheme must conform to the one person, one vote requirement.

Under the Island County scheme, all voters in the entire county participate in selecting county commissioners from the pool of candidates for each position. Thus, the inequality of population does not directly affect the general election. The inequality does, however, affect the primary election, which is the generally used procedure for nominating candidates in Island County. Because each primary is held solely within the respective district, the voters of district three nominate a candidate for a commissioner position, just as do the voters of districts one and two. As a result, the voters of district three exercise a voting strength in the primary election that equals the voting strength of each of the two other districts, even though these other districts are far larger in population.

■ The one person, one vote principle requires equal representation in the procedure for nominating candidates, just as it requires equality in the general election. *See, e.g., Moore v. Ogilvie,* 394 U.S. 814, 23 L. Ed. 2d 1, 89 S. Ct. 1493 (1969); *Gray v. Sanders,* 372 U.S. 368, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963); L. Tribe, *supra* at 794–98. In *Moore v. Ogilvie, supra,* the United States Supreme Court explained that in nomination procedures as in election procedures, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Moore,* at 819. "All procedures used by a State as an integral part of the election process must pass muster against the charges of

discrimination or of abridgement of the right to vote." *Moore,* at 818. Since the Island County primary election procedure thus is subject to the one person, one vote requirement, the Island County districts must be of "substantial equality of population" in order to permit voters in each district to exercise approximately equal voting strengths in nominating candidates.

In addition to having a direct impact on the primary, the inequality of population also has an indirect effect on the general election. As a result of the single–district primary procedure as applied in Island County, the voters in the countywide general election are presented with a group of candidates for one of the commissioner positions which has been preselected by the disproportionately low population of district three. These candidates need not necessarily have expressed views that would be attractive to a substantial part of the county, and may in fact be committed to the narrowest of regional interests. This indirect effect on the general election is a further basis for requiring substantial equality of population among the commissioner districts in Island County.

Appellants assert that the election scheme challenged in this case is no different from the schemes approved in *Dusch v. Davis,* 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554 (1967) and *Dallas County v. Reese,* 421 U.S. 477, 44 L. Ed. 2d 312, 95 S. Ct. 1706 (1975). In *Dusch* and *Dallas County,* as in the present case, the election schemes imposed a residency requirement, and specified that each of the elected county officers must live in a different district of the county. The court held in these cases that such a scheme was not unconstitutional because the districts were used "'merely as the basis of residence for candidates, not for voting or representation.'" *Dusch,* at 115; *Dallas County,* at 479–80. However, the Island County election scheme differs from the *Dusch* and *Dallas County* schemes in that it establishes a *primary* election system in which the districts *are* used for voting. It is this primary election

system and not the residency requirement, which causes unequal representation under the Island County scheme. The single–district primary system combines with the inequality of population among the districts to confer a disproportionate voting strength on the residents of district three.

It still remains to be determined whether the inequality in this case is so substantial as to require invalidation of the Island County district scheme. In applying the one person, one vote analysis, the degree of inequality of voter representation is measured by the ratio of the largest district to the smallest and by the combined percentage deviation from the average. *See, e.g., Mahan v. Howell,* 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973).[1]

An examination of prior case law reveals that the disparity in this case greatly exceeds disparities that have been struck down as impermissibly large. In *Lucas v. Forty–Fourth Gen. Assembly,* 377 U.S. 713, 12 L. Ed. 2d 632, 84 S. Ct. 1459 (1964), the court struck down an election scheme with a ratio of 3.6 to 1 and a percentage deviation of 115.44 percent. In *WMCA, Inc. v. Lomenzo,* 377 U.S. 633, 12 L. Ed. 2d 568, 84 S. Ct. 1418 (1968), the court invalidated an election scheme with a ratio of 2.6 to 1 and percentage deviation of 88 percent. In the present case, the ratio of largest district to smallest is 6.87 to 1, and the percentage deviation is 168.62 percent. The disparity is approximately one and a half times as great as the disparity struck down in *Lucas* and double the disparity struck down in *WMCA.* Such a disparity is far too great to meet the bedrock requirement of "substantial population equality."

---

[1] The ratio figure is obtained by simply comparing the population of the largest district with that of the smallest. The percentage deviation figure is obtained by ascertaining first, the average size of the districts. The percentage by which the largest district is overpopulated and the percentage by which the smallest district is under the average are computed. These two figures are added together to yield the total deviation figure.

Appellants urge that in gauging the degree of inequality in the present case, we should employ registered voter figures, rather than resident population figures. They argue that the population of district two is not a proper basis for analysis due to the large transient population caused by the presence of the naval base. The analysis in prior cases has focused on resident population figures rather than registered voter figures (*see, e.g., Mahan v. Howell, supra* at 319) and we continue to apply this analysis. However, even if the registered voter figures were employed in this case, the inequality would still be too great to satisfy constitutional requirements. With the voter registration figures as the standard, the ratio would be 3.05 to 1 and the percentage deviation would be 95.18 percent. Disparities of this magnitude were struck down as unconstitutional in *Lucas v. Forty–Fourth Gen. Assembly, supra,* and *WMCA, Inc. v. Lomenzo, supra.*

Because Island County apportionment is so disproportionate that it cannot meet the overriding requirement of substantial population equality, we need not reach the second part of the constitutional test—the examination of the purported justifications for the deviation. A legitimate, rational state policy will justify a deviation in apportionment only if the deviation is minor. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 577, 579, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964). The deviation in this case is not "minor" by any accepted measurement.

Appellants argue finally that we should not invalidate the Island County scheme because the majority of voters in the county have not acted to change the present election scheme. Appellants point out that the procedure for establishing unequal districts pursuant to RCW 36.32-.020(1) is optional, and that the voters of Island County could change to an equal district scheme by electing county commissioners who favor such a scheme. Appellants conclude, accordingly, that the majority of voters in the county endorse the scheme and therefore that the scheme should be upheld. The fact that the voters in a county have failed

to act through their elected commissioners to change an election scheme does not necessarily mean that the voters approve of the scheme. In the present case, this conclusion is particularly questionable because the very same problems in the scheme that lead to its unconstitutionality also impede the majority from fully expressing its preferences in selecting commissioners who will change to an equal district scheme. However, even if the majority of voters in the county did approve of the present election scheme, we could not uphold an unconstitutional election scheme. As the United States Supreme Court declared in *Lucas v. Forty–Fourth Gen. Assembly,* 377 U.S. 713, 736–37, 12 L. Ed. 2d 632, 84 S. Ct. 1459 (1964):

> An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. . . . A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.

In this case, the rights of respondent Edward Story and other residents of districts one and two are being violated, and their constitutional right to an equally weighted vote cannot depend on the wishes of the majority of voters in their districts or the county.

The present Island County district scheme for electing county commissioners violates the equal protection clause of the fourteenth amendment to the United States Constitution. We affirm the decision of the trial court holding the scheme unconstitutional and granting a writ of mandamus directing the commissioners of the county to redraw district lines in conformance with RCW 36.32.020 so that each of the three districts comprises, as nearly as possible, one–third of the population of the county.

STAFFORD, BRACHTENBACH, HOROWITZ, and WILLIAMS, JJ., concur.

WRIGHT, J. (concurring)—I reluctantly concur. The United States Constitution is the supreme law of the land. U.S. Const. art. 6. Despite the strong practical reasons which would indicate a different result, I feel bound by the supreme law.

HICKS, J. (dissenting)—Since *Story v. Anderson,* 91 Wn.2d 667, 588 P.2d 1179, 590 P.2d 1272 (1979) was decided, the personnel of this court has changed, and upon rehearing so did the court's decision in the case. I regret that action for it deprives the United States Supreme Court of an opportunity to proclaim that good common sense is also good constitutional law.

The general scheme of county government, where the commissioner system is used, is set forth in the majority opinion. Each commissioner district in the county is to have approximately the same population. RCW 36.32.020. The legislature has, however, recognized that counties comprised entirely of islands may have valid local reasons for having districts that do not meet the equal population criterion, and it provided for those counties by section (1) of RCW 36.32.020. The section provides:

> The commissioners of any county composed entirely of islands *may* divide their county into three commissioner districts without regard to population, except that if any single island is included in more than one district, the districts on such island shall comprise, as nearly as possible, equal populations;

(Italics mine.)

Island County consists, for all practical purposes, of Whidbey Island and Camano Island. The commissioners of the county opted to use the quoted section and divided Whidbey Island into two commissioner districts and constituted Camano Island the third district. As the majority opinion details, the population of Camano Island is substantially less than the population of either of the two commissioner districts on Whidbey Island.

I can see no practical reason for invalidating this scheme. The local population is satisfied. If it were not, it could and would have effected a change. The present plan was not forced on the county by the legislature. Rather, it was provided as an option which Island County could utilize or not, as it chose. The commissioners of the county adopted the current plan as one best meeting the local needs of Island County. Any time two of the commissioners are convinced otherwise, they can change the districts. This is complete local control.

No invidious discrimination is visited upon any person or group in Island County by the current scheme of electing commissioners. No majority is trampling on the rights of a minority, nor is a minority in any manner holding a majority in bondage. All in reality that is being accomplished is that Camano Island is assured of a representative on the board of commissioners by what, in effect, is a residency requirement. If the primary election nominating process provided for countywide voting as does the general election, no constitutional defect could be found with the current scheme. *Dallas County v. Reese*, 421 U.S. 477, 44 L. Ed. 2d 312, 95 S. Ct. 1706 (1975).

It is little wonder the majority of Island County citizens are content to let Camano Island folks nominate from among their own the candidates for county commissioner, for the entire county electorate makes the final selection in the general election. Of what import is it to the ordinary voter on Whidbey Island that theoretically fewer voters on Camano Island can nominate a candidate for commissioner than can voters on Whidbey Island? I venture to say little or none.

The majority, however, finds constitutional evil because there are less potential voters in the Camano Island commissioner district than the two on Whidbey Island. Camano Island voters have more theoretical weight to each of their votes in the primary than do voters in the other two districts. I say "theoretical weight" for there is no weight to a vote not cast and primary elections are notorious for light

votes. Those who do not vote at all cannot be much concerned with the "weight" of the votes of those who do. That the residents of the Whidbey Island districts are not disturbed is patent, or they would prevail upon their commissioners to change the system.

As the majority opinion is written, it stands for the proposition that one malcontent is entitled to have this court demolish a working commissioner system even if every other person in the county approved of it. That, to me, is constitutionalism for the sake of constitutionalism and makes little sense.

In this instance, the court mandates redistricting. That means Camano Island will be in a commissioner district with a majority of the population on Whidbey Island. In all likelihood that portends, sooner or later, that the district's commissioner will not reside on Camano Island. Thereby the majority of this court forces upon the county what the majority of its voters obviously did not want or the system would long since have been changed.

Prior to the rehearing of this case, the court requested the Attorney General to submit a brief as amicus curiae. Such a brief was provided. In the amicus brief the court was urged to adhere to its original opinion (*Story v. Anderson, supra*). In my view, the court would have been well advised to follow the recommendation of the Attorney General in this case.

I dissent.

ROSELLINI and DOLLIVER, JJ., concur with HICKS, J.